George W. SHINABARGER, Plaintiff,

v.

UNITED AIRCRAFT CORPORATION
and Liberty Mutual Insurance
Company, Defendants.

Civ. No. 10239.

United States District Court
D. Connecticut.

June 20, 1966.

Herbert Watstein, of Watstein & Watstein, Bristol, Conn., for plaintiff.

John D. Fassett and Frank E. Callahan, of Wiggin & Dana, New Haven, Conn., for defendants.

TIMBERS, Chief Judge.

Defendant United Aircraft Corporation (United Aircraft) has moved, pursuant to Rule 56, Fed.R.Civ.P., for summary judgment in its favor on each of the six counts of the complaint in this action commenced January 16, 1964 by plaintiff, a truck driver, to recover damages for personal injuries claimed to have been sustained October 9, 1961 while he was participating in the unloading of a truck load of helicopter blades which he had delivered to United Aircraft's Sikorsky Division at Bridgeport, Connecticut. Having delayed two years and three months in bringing suit to recover damages for personal injuries in a state with a one year statute of limitations governing such actions, plaintiff's multi-count complaint obviously is cast in an effort to circumvent the bar of the statute.

■ United Aircraft's summary judgment motion is based on the pleadings, depositions, answers to interrogatories, admissions on file, an affidavit of plaintiff's attorney and documentary exhibits. Viewing the inferences to be drawn from the underlying facts contained in these materials in the light most favorable to plaintiff as the party opposing the instant motion, United States v. Diebold, Inc., 369 U.S. 654, 655 (1962), the Court nevertheless holds that there is no genuine issue as to any material fact and that United Aircraft is entitled to judgment in its favor as a matter of law on each count of the complaint. Dressler v. MV Sandpiper, 331 F.2d 130 (2 Cir. 1964).

United Aircraft's motion for summary judgment accordingly is granted.

## FACTS

There is no dispute with respect to the material facts necessary to a determination of this motion for summary judgment.

*Jurisdiction*

Jurisdiction is founded on diversity of citizenship and the requisite jurisdictional amount.[1]

Plaintiff is a citizen of Michigan. Defendant United Aircraft, being a Delaware corporation and having its principal place of business in Connecticut, is a citizen of both states.[2] Defendant Liberty Mutual Insurance Company (Liberty Mutual), United Aircraft's liability insurer, being a Massachusetts corporation and having its principal place of business in Massachusetts, is a citizen of that state.

The amount in controversy exceeds $10,000, exclusive of interest and costs.

*The Accident*

On October 9, 1961 plaintiff delivered to United Aircraft's Sikorsky Division at Bridgeport a shipment of 13 helicopter blades in a trailer truck. The blades, originally manufactured by United Aircraft, were being returned via common carrier, U.S.A.C. Transport Company (plaintiff's employer), to United Aircraft by the federal government's Air Material

---

1. 28 U.S.C. § 1332(a) (1).

2. 28 U.S.C. § 1332(c).

Command, Marietta, Pennsylvania, for periodic overhaul and repair.

In delivering the blades, plaintiff first reported to United Aircraft's receiving department at Sikorsky where he gave bills of lading to Sabetta, a United Aircraft employee. Sabetta, as a receiver, inspected incoming freight to see that it was in proper condition and supervised the subsequent unloading. After initially checking the shipment, Sabetta directed plaintiff to the end of the flight field where helicopter blades customarily were unloaded and stored.

The trailer truck was a closed van type. The van was approximately 40 feet long, 8 feet wide and 8 feet high. The load consisted of three stacks of blades. Two stacks had four blades each; the other stack had five blades. Each blade was packed in a box approximately 26 feet long, 2 feet wide and 18 inches high. The boxes containing the blades in each of the three stacks were strapped together. Each stack rested on a skid which raised the stack 5 inches above the floor of the trailer, thereby facilitating unloading. The stacks were positioned in the trailer so that the blade ends nearest the rear of the trailer lay 10 feet in from the rear door. The single stack of five blades was nearest the wall of the trailer on the driver's left.

The two stacks of four blades each were unloaded first; the procedure followed was the same for both stacks. Plaintiff entered the trailer where he secured one end of a tow chain to the bottom of the stack. He then left the trailer for the remainder of the unloading process. Stevens, a United Aircraft employee, secured the other end of the chain to a tow motor, also referred to as a fork lift, which was operated by Sagliano, another United Aircraft employee. The tow motor pulled the near end of the stack 2 or 3 feet straight out from the end of the trailer to a point where the forks of the tow motor could be maneuvered under the stack. After Stevens detached the chain from the stack, Sagliano then approached the stack from the side in such a way that the forks of the

tow motor were maneuvered under the end of the stack overhanging the rear of the trailer. After Stevens chained that part of the stack to the tow motor, Sagliano lifted the end of the stack and pulled it almost entirely out of the trailer to a point where the near end of the stack was lowered on a horse while the far end still rested on the trailer. Sagliano then drove the tow motor around to the middle of the stack where the center of balance was marked, picked up the stack with a tow motor forks and deposited the stack at the hold area which was approximately 20 feet from the trailer. There Sabetta checked the serial numbers on the blade containers.

To unload the third stack of five blades, plaintiff again entered the trailer to secure one end of the tow chain to the stack. Departing from his procedure in unloading the first two stacks, however, plaintiff did not leave the trailer prior to the initial pulling of the stack. Since the third stack was positioned against the left wall of the trailer from which there extended laterally a 4 or 5 inch metal ridge, it was necessary, before pulling the stack straight out of the trailer, to pull it laterally several feet to the right in order to avoid catching the stack on the metal ridge. Sagliano, following the same procedure as he had with the first two stacks, then pulled the third stack straight out from the trailer to the point where the forks of the tow motor could be maneuvered under the stack. Plaintiff, at that time, was standing in the part of the trailer nearest the cab of the truck. Stevens picked up from the ground the tow chain after it had been detached from the stack. Sagliano was approximately 6 or 7 feet from the stack, maneuvering the tow motor into position where the forks could be directed under the near end of the stack. The stack started to tip over toward the right wall of the trailer. Stevens shouted. Plaintiff, observing the stack starting to tip, attempted to escape through the rear of the trailer. The stack fell on plaintiff, pinning him against the right wall of the trailer. Sagliano with

the tow motor immediately lifted the blades off plaintiff. Sabetta, who at the time of the accident was inspecting the first two stacks in the hold area and therefore did not see the third stack fall on plaintiff, together with Stevens, extricated plaintiff and helped him off the trailer to the ground.

 Sabetta, Sagliano and Stevens testified that it was customary for truck drivers delivering shipments of helicopter blades to attach tow chains to stacks of blades loaded on the trucks (Sabetta Deposition, p. 19; Sagliano Deposition, pp. 24, 49; Stevens Deposition, p. 6). In order initially to pull helicopter blades out from a truck trailer it was necessary to "gun" the engine of the tow motor; this could cause a stack of blades to lurch forward (Sabetta Deposition, pp. 14–16). Sagliano testified, however, that the third stack responded smoothly to the initial pull and did not lurch forward (Sagliano Deposition, pp. 60–61). Sagliano, Sabetta and Stevens were aware that blades stacked in the same manner as those in plaintiff's truck could tip over (Sagliano Deposition, p. 28; Sabetta Deposition, p. 8; Stevens Deposition, pp. 20–21). Stevens had seen similar stacks fall before (Stevens Deposition, p. 21); Sagliano had not (Sagliano Deposition, p. 28). This type of load, due to the construction of the closed trailer and the length of the blades, was difficult to tow (Stevens Deposition, p. 7; signed statement of Sagliano dated October 10, 1961, p. 2 [3]). Removing the third and last stack from the trailer, according to Stevens, was the most dangerous stage of the unloading operation because if that stack tipped there were no other stacks in the trailer to prevent it from completely tipping over (Stevens Deposition, pp. 19–20).

In view of the danger inherent in remaining in the trailer once pulling began, Sabetta made it a practice to warn truck drivers either to leave the trailer or to remain in that part of the trailer nearest the cab—in the space between the front wall of the trailer and the forward end of the stacks (Sabetta Deposition, p. 8). Sabetta could not recall whether he told plaintiff to get off the trailer before the third stack was pulled, although he believed that he warned plaintiff "to get clear of the load" (Sabetta Deposition, p. 8). Sagliano testified that Sabetta, in warning plaintiff to get down from the rear of the trailer, told plaintiff, "You know, if you are going to stay on the truck, you know, just keep a clear distance away from the side of the truck. In other words, stay in front of the truck to be out of the way of the blades." (Sagliano Deposition, p. 30). Many truck drivers, according to Sagliano, remained in the front of the trailer during unloading in order to stay

3. Plaintiff's Exhibit D.
 As to material which a court properly may consider in determining a motion for summary judgment, Professor Moore states:
 "In brief, in addition to pleadings, depositions, admissions on file, answers of a party to interrogatories, and affidavits, which Rule 56(c) specifically enumerates, a court may consider oral testimony, *and any other or additional materials that would be admissible in evidence or otherwise usable at trial.*
 Material that does not come within the above broad category should not be considered." (Emphasis added) 6 Moore's Federal Practice ¶56.11 [1.–8], at 2149–2150 (2d ed. 1965).
 It appears that Sagliano's statement signed, although not sworn to, the day after the accident would be either "admissable in evidence" or "otherwise usable at trial." The liberal spirit of federal summary judgment procedure would not be served by excluding this statement from consideration by the Court on the instant motion. Whitaker v. Coleman, 115 F.2d 305, 307 (5 Cir. 1940). All else aside, the existence of such a statement, although not presently in evidentiary form, should alert the summary judgment court to the availability at the trial of the facts contained in the statement, Whitaker v. Coleman, supra at 307; accordingly, the existence of such a statement precludes the summary judgment court from drawing an inference adverse to plaintiff as the party opposing the motion with respect to the facts contained in the statement. This Court so holds with respect to the Sagliano statement. United States v. Diebold, Inc., supra at 655.

out of reach of the blades (Sagliano Deposition, p. 30). In his unsworn signed statement dated October 10, 1961, however, Sagliano stated that "no one told [plaintiff] or warned [plaintiff] to get off."

When Sagliano started pulling the third stack, he knew plaintiff was in the trailer, but thought he was in the front part. Sagliano told plaintiff, "I am going to start pulling them out", to which plaintiff replied, "All right." (Sagliano Deposition, pp. 54–55).

*Plaintiff's Post-Accident Negotiations With Liberty Mutual* [4]

On October 10, 1961 at the Bridgeport Hospital, Liberty Mutual, the liability insurer of United Aircraft, took plaintiff's statement concerning the October 9 accident.

On October 23, 1961 plaintiff retained Donald P. Howard, Esq., a Michigan attorney, to represent him in his personal injury claim against United Aircraft. Howard, in a letter to Sikorsky Aircraft Company dated October 27, 1961, notified defendants that he represented plaintiff, requested that receipt of his letter be acknowledged either by Sikorsky or its insurer and stated that he would then outline the special damages sustained by plaintiff. (Defendants' Request to Admit, ¶A(1) [referring here and hereinafter, unless otherwise indicated, to Defendants' Request To Admit dated May 5, 1965]). George M. Grulke, a claims supervisor of Liberty Mutual at Detroit, in a letter to Howard dated November 22, 1961, stated that Howard's letter of October 27 had been referred to him and requested Howard to contact him by telephone at Howard's convenience (Defendants' Request To Admit, ¶A(2)).

Howard alleges that on many occasions during 1961 and 1962 Grulke and three other representatives of Liberty Mutual —Messrs. Harvey, Hayden and Kronhart—told him that the accident was the fault of United Aircraft and that plaintiff's damages would be paid, and asked Howard for his continued cooperation. This cooperation was given, according to Howard, by his furnishing Liberty Mutual with plaintiff's medical and dental reports and by his forbearance in not bringing suit.

On June 8, 1962 Howard wrote to Grulke, enclosing a copy of a report prepared by plaintiff's dentist, Dr. George C. Taft, and stating that Liberty Mutual would be advised as to a date when plaintiff would submit to examination by a dentist selected by Liberty Mutual (Defendants' Request To Admit, ¶A(3)). Plaintiff was examined on September 25, 1962 by Liberty Mutual's dentist, Dr. John Holston. On November 30, 1962 Harvey on behalf of Liberty Mutual wrote to Howard enclosing a copy of Dr. Holston's report dated October 4, 1962 (Plaintiff's Exhibit C) and thanking Howard for his continued cooperation (Plaintiff's Exhibit A).

Howard, in a letter to Liberty Mutual dated January 15, 1963, set forth plaintiff's special damages and claimed total damages in amount of $19,590.00 (Defendants' Request To Admit, ¶A(4)). In letters to Liberty Mutual dated February 8 and March 15, 1963, Howard, referring to Liberty Mutual's failure to reply to his January 15, 1963 claim letter, requested a response (Defendants' Request To Admit, ¶¶A(5) and A(6)).

Hayden, claims manager for Liberty Mutual, telephoned Howard on April 30, 1963, advising him that plaintiff's claim would be paid "very soon". Kronhart, a Liberty Mutual claims adjuster, during a visit to Howard's office on June 27, 1963, informed Howard that the claim would be paid within two weeks. On July 26, 1963, however, Kronhart wrote to Howard declining voluntary payment of plaintiff's damages for the reason that Liberty Mutual's investigation indicated that sole responsibility for the accident did not rest with United Aircraft (Plain-

---

4. The facts regarding events subsequent to the October 9, 1961 accident, unless otherwise indicated, are adduced from the affidavit of plaintiff's attorney, Donald P. Howard, in opposition to the instant motion for summary judgment.

tiff's Exhibit B). This was the first time, according to Howard, that Liberty Mutual had indicated that United Aircraft was not solely responsible for the accident.

## CLAIMS OF THE PARTIES

Plaintiff's six count complaint filed January 16, 1964, as amended April 3, 1964 and April 8, 1964, alleges: (i) that United Aircraft, through its employee, *wilfully* and *intentionally* injured plaintiff; (ii) that United Aircraft, through its employee, *negligently* injured plaintiff; (iii) that United Aircraft breached an express and/or implied contract with U.S.A.C. Transport, of which plaintiff was a third-party beneficiary, whereby United Aircraft agreed to unload in a reasonable manner the truck driven by plaintiff; (iv) that United Aircraft breached a similar contract with plaintiff; (v) that Liberty Mutual, having admitted to plaintiff or his attorney liability on the part of United Aircraft, breached a contract of settlement whereby Liberty Mutual agreed to compensate plaintiff for his injuries if plaintiff would refrain from bringing suit; and (vi) that Liberty Mutual fraudulently concealed from plaintiff the Connecticut one year statute of limitations for personal injury actions and fraudulently represented that it was liable to plaintiff for his injuries and that it would pay plaintiff's damages.

United Aircraft, in moving for summary judgment dismissing as to it all counts of the complaint, asserts, with respect to the six counts above enumerated: (i) that there is no evidence to support plaintiff's claim of intentional tort, and, even if there were such evidence, United Aircraft is not liable for the intentional torts of its employees; (ii) that plaintiff's claim of negligence is barred by the Connecticut one year statute of limitations (Conn.Gen.Stat. § 52–584 (1958)); (iii) and (iv) that United Aircraft had no contracts with either U.S. A.C. Transport or plaintiff whereby United Aircraft agreed to unload plaintiff's truck in a reasonable manner and, even if such contracts did exist, plaintiff's claims, sounding primarily in tort, are barred by the Connecticut one year statute of limitations (Conn.Gen.Stat. § 52–584 (1958)); and (v) and (vi) that plaintiff's claims of breach of settlement contract and fraudulent representations and concealment assert causes of action against Liberty Mutual only, not against United Aircraft.

## COUNT ONE

Under Connecticut law[5] a cause of action founded on a wilful or intentional tort is governed by the three year statute of limitations (Conn.Gen.Stat. § 52–577 (1958)), rather than the one year statute of limitations (Conn.Gen. Stat. § 52–584 (1958)) which governs an action founded on negligence or reckless or wanton misconduct.[6]

An injury wilfully or intentionally inflicted—sometimes referred to as a battery—as contrasted with one negligently, recklessly or wantonly inflicted, must be prompted by a "design to injure, either actually entertained, or to be implied from the conduct and circumstances."[7] Absent an intent to cause injury, there can be no intentional tort. Accordingly, an intention merely to do the *act* which causes injury does not satisfy the requirement of intent. "Not only the action producing the injury but the resulting injury must be intentional."[8] The element of intent essential to

5. Neither party disputes the applicability of Connecticut law. See Klaxon v. Stentor Electric Mfg. Co., 313 U.S. 487 (1941); Ricciuti v. Voltarc Tubes, Inc., 277 F.2d 809 (2 Cir. 1960).

6. Milford v. Swarbrick, 24 Conn.Sup. 320, 190 A.2d 493 (Super.Ct.1963); see Antinozzi v. D. V. Frione & Co., 137 Conn. 577, 79 A.2d 598 (1951).

7. Rogers v Doody, 119 Conn. 532, 534, 178 Atl. 51, 52 (1935), quoting from Sharkey v. Skilton, 83 Conn. 503, 507, 77 Atl. 950 (1910); Simenauskas v. Connecticut Co., 102 Conn. 676, 129 A. 790 (1925).

8. Rogers v. Doody, supra note 7, at 534.

an action for battery has been summarized as follows:[9]

"In order that an act may be done with the intention of bringing about a harmful or offensive contact or an apprehension thereof to a particular person, either the other or a third person, the act must be done for the purpose of causing the contact or apprehension or with knowledge on the part of the actor that such contact or apprehension is substantially certain to be produced. It is not enough that the act itself is intentionally done and this, even though the actor realizes or should realize that it contains a very grave risk of bringing about the contact or apprehension. Such realization may make the actor's conduct negligent or even reckless but unless he realizes that to a substantial certainty, the contact or apprehension will result, the actor has not that intention which is necessary to make him liable [for battery]."

The Court, having considered all evidence upon which plaintiff bases his claim of a wilful and intentional tort, including the Sabetta, Stevens and Sagliano depositions, and having drawn all inferences of fact in favor of plaintiff,[10] finds not one shred of evidence to support plaintiff's bare allegation of wilfulness.

■ The testimony of Sabetta, Stevens and Sagliano, upon which plaintiff primarily relies, is devoid of any indication that they committed any act during the unloading process for the purpose of injuring plaintiff or with knowledge that injury was substantially certain to result. Viewing their statements in the light most favorable to plaintiff, they merely show that all three were aware that blades stacked in the same manner as those in plaintiff's truck could fall;

that the greatest danger from the toppling of the blades existed during the unloading of the last stack; that if plaintiff remained in the rear part of the truck during the pulling of the third stack, he would be in danger; that Sagliano and Stevens knew plaintiff was somewhere on the truck when they began pulling the last stack; and that no one warned plaintiff of the danger. This falls far short of the design to injure required to sustain a claim of wilful or intentional tort.

■ Plaintiff rests his opposition to the instant motion as addressed to the first count solely on conclusory allegations in his complaint, the employee depositions and Sagliano's signed statement. The depositions and Sagliano's statement conclusively establish the absence of a triable issue of material fact with respect to plaintiff's wilful and intentional tort claim. Conclusory allegations in plaintiff's complaint, of course, are insufficient to forestall the award of summary relief.[11]

There being no genuine issue as to any material fact with respect to plaintiff's claim of wilful and intentional tort and United Aircraft being entitled to judgment in its favor as a matter of law, the latter's motion for summary judgment dismissing as to it the first count of the complaint is granted.

## COUNT TWO

Plaintiff's cause of action for negligence, having been brought in this Court more than one year after the injury was sustained, is barred by the Connecticut one year statute of limitations (Conn. Gen.Stat. § 52–584 (1958)), unless, as plaintiff urges, United Aircraft is equitably estopped from asserting that bar by reason of the representations made to

9. Restatement, Torts § 13, comment d, (1934); accord, Prosser, Torts § 8, at 32 (3d ed. 1964).
 Connecticut has adopted the Restatement formulation of intent. Rogers .v. Doody, supra note 7, at 535.

10. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); 6 Moore's Federal Practice ¶56.15 [3] (2d ed. 1965).

11. Dressler v. MV Sandpiper, 331 F.2d 130, 132 (2 Cir. 1964), and authorities cited at 132.

plaintiff's attorney by representatives of Liberty Mutual.[12]

Plaintiff, to establish the existence of a triable issue of fact with regard to equitable estoppel, relies primarily on the affidavit of Donald P. Howard, attorney for plaintiff during the post-accident negotiations with Liberty Mutual. This affidavit is uncontroverted; United Aircraft, for the purpose of this motion, concedes the truth of the facts therein alleged. It contends, however, that the evidence adduced from that affidavit, from plaintiff's exhibits and from Defendants' Request To Admit fails to raise a triable issue of fact and that plaintiff's claim of equitable estoppel is invalid as a matter of law.

The Court has had occasion within the past year to review the doctrine of equitable estoppel in a case [13] involving facts, upon this issue, closely paralleling those of the instant case; there plaintiffs' claim of equitable estoppel was held invalid.

The differences between the two cases are of insufficient legal consequence to warrant a different finding in the instant case. In *Bealle*, representatives of defendants' insurer, in addition to conceding the insured's liability, represented to plaintiffs' attorney that they wanted to make a fair settlement and that whenever the attorney furnished the insurer with an accurate estimate of plaintiffs' special damages they would negotiate a fair settlement. Here, Liberty Mutual, in addition to conceding the liability of United Aircraft, represented to Howard that plaintiff's damages would be paid and asked for Howard's continuing co-

operation. All direct communications between the insurer and plaintiffs' attorney in *Bealle* antedated by four months the expiration of the Connecticut one year statute of limitations, whereas here there were communications both before and after the expiration date—the majority being after, according to Howard's affidavit.[14]

The Court finds that no ordinarily prudent attorney would rely reasonably on the representations made by Liberty Mutual as indicating the insurer intended to waive the one year statute of limitations applicable to plaintiff's negligence claim. At no time during the course of negotiations between Liberty Mutual and Howard did any representative of Liberty Mutual mention the statute of limitations, much less represent that Liberty Mutual would waive it. Nor was there any request, express or implied, for forbearance in bringing suit. Howard alleges that Liberty Mutual asked for his "continuing cooperation", which he gave by furnishing medical reports and by not bringing suit. A request not to bring suit clearly was not explicit, nor was it reasonably implicit, in a request for continued cooperation. By delaying the bringing of suit, Howard gave gratuitously something for which Liberty Mutual did not ask.

Liberty Mutual's representations, viewed reasonably, merely indicated that it admitted United Aircraft's liability and would subsequently pay what it, not plaintiff, determined to be plaintiff's damages when furnished with a more accurate account of those damages. The matter of damages was never seriously negotiated prior to the expiration of the

12. Supra, p. 57.

13. Bealle v. Nyden's, Incorporated, 245 F. Supp. 86, 92–95 (D.Conn.1965).

14. Defendant argues, in accordance with what appears to be the general rule in other jurisdictions, that the Court may properly consider only those representations claimed as the basis for estoppel which occurred prior to the expiration of the limitation period. Bealle v. Nyden's Incorporated, supra note 13, at 95 n. 31; see Annot., 24 A.L.R.2d 1413, 1423 (1952)

and Annot., 130 A.L.R. 8, 18 (1941).
No Connecticut court, so far as this Court has been able to ascertain, has applied this principle in determining a question of equitable estoppel. The Court finds it unnecessary to apply the principle here—nor to assess its acceptability in this jurisdiction—in considering the evidence of representations made before and after Section 52–584 expired; for the Court finds plaintiff's claim of equitable estoppel invalid.

statute of limitations. Howard's letter setting forth plaintiff's claims of special and total damages was addressed to Liberty Mutual on January 15, 1963, more than three months after the limitation period had expired.

 Howard's reliance on this insurer's admission of liability and proposal to pay at some indefinite time an undisclosed amount of damages as obviating the necessity of bringing a timely suit, is no more reasonable than the attorney's reliance in *Bealle* on the insurer's admission of liability and proposal to negotiate at some future time a fair settlement. In short, the Court finds the equities in favor of Shinabarger's claim of estoppel here no more compelling than those asserted in support of the Bealles' claim.[15]

The Court holds that plaintiff's claim of equitable estoppel presents no genuine issue as to any material fact and that United Aircraft as a matter of law is not estopped from asserting the bar of Section 52–584. United Aircraft's motion for summary judgment dismissing as to it the second count of the complaint is granted.

### COUNTS THREE AND FOUR

Plaintiff's allegations of express and/or implied contracts, of which he claims to have been a third party beneficiary in count three and to which he claims to have been a party in count four, whereby United Aircraft agreed to unload the truck in a reasonable manner, are based primarily on a tariff provision of U.S.A.C. Transport designated "Rules Tariff No. 1, Section II—Accessorial Charges, Item 195." [16]

Plaintiff's claim of breach is twofold: by causing plaintiff to help in the unloading, United Aircraft, as consignee of the blade shipment, breached that clause of Item 195 which provides that "The consignor shall perform the loading and the consignee shall perform the unloading"; and, by failing to exercise reasonable care in unloading the truck, United Aircraft breached the contract to unload the truck properly which, according to plaintiff, is implicit in the clause requiring the consignee to perform the unloading.

 Plaintiff's claim is untenable. The tariff provision, assuming it was applicable to the shipment in question, was merely a rate provision formulated and issued by the common carrier, U.S.A.C. Transport, as part of its contract of carriage. It is clear from a reading of the provision that it in no way was intended to establish any obligation on the part of a consignee as to the *manner* in which unloading was to be per-

---

15. Nor does it appear that any greater diligence was exercised here. Suit was not instituted in this Court until January 16, 1964—more than two years after the accident and nearly six months after Howard received Liberty Mutual's letter denying sole responsibility on the part of United Aircraft.

16. *"LOADING AND UNLOADING*
 (A) The rates named herein do not include loading and unloading. The consignor shall perform the loading and the consignee shall perform the unloading. All shipments must be properly packed and braced by the consignor to protect against damage during the normal course of transportation. Costs of packing and bracing shall not be at the expense of the carrier. Carrier shall not be responsible for damage directly caused by improper or insufficient preparation of the freight for shipment nor by loading or unloading by consignor or consignee.
 (B) Upon request, the carrier shall perform loading and unloading service subject to the following charges:
 (1) $4.00 per hour per man for ordinary labor, also
 (2) Cost plus 10% of necessary equipment rental and materials required.
 The minimum charge shall be $25.00 per vehicle."
 See Plaintiff's Answers to Defendants' Interrogatories, ¶¶ 8–11, filed September 26, 1964 in response to Defendants' Interrogatories, ¶¶ 8–11, filed March 17, 1964; Defendants' Request for Admission, ¶ 1, filed October 23, 1964; Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment, p. 4.

formed. The construction of a contract, which does not depend on extrinsic facts, is a matter of law for determination by the court under Connecticut law[17]; and a court, under the guise of interpretation, may not modify a contract by adding terms the parties did not see fit to include.[18]

Furthermore, there is no evidence whatsoever to support plaintiff's conclusory allegation that United Aircraft caused him to perform part of the unloading. The testimony of Sagliano, Stevens and Sabetta, that it was customary for truck drivers delivering similar shipments to mount their trailers for the purpose of securing the tow chain to the blade stacks,[19] is uncontroverted, as is Sabetta's testimony that there was no discussion between plaintiff and any employee of United Aircraft about plaintiff's entering the trailer.[20] Plaintiff has offered no evidence tending to show that plaintiff was directed or even requested to help with the unloading; all the evidence strongly indicates that plaintiff's services were voluntarily rendered.

■ Even assuming, however, that plaintiff was directed to help unload the trailer, that this constituted a breach of United Aircraft's contractual obligation under the tariff provision and that the tariff provision applied to the shipment in question, plaintiff as a matter of law was neither a third-party beneficiary nor a party to the contract.

The Court holds that plaintiff's claims of breach of contract set forth in counts three and four present no genuine issue as to any material fact and that United Aircraft as a matter of law is entitled to judgment. United Aircraft's motion for summary judgment dismissing as to it

the third and fourth counts of the complaint is granted.

### COUNT FIVE

United Aircraft contends that plaintiff's claim that Liberty Mutual breached a contract of settlement whereby it agreed to pay plaintiff's damages in exchange for plaintiff's forbearance in not bringing suit fails to allege a cause of action against United Aircraft. Plaintiff argues that inasmuch as the fifth count alleges that Liberty Mutual was the liability carrier for United Aircraft, the latter, as principal, may be bound by the acts of its agent-insurer.

The fifth count being wholly without merit, the Court bases its determination on broader grounds and finds it neither necessary nor appropriate to reach the principal-agency question.

■ Liberty Mutual's letters dated November 30, 1962 and July 26, 1963 to attorney Howard (Plaintiff's Exhibits A and B attached to the Howard affidavit), according to plaintiff's claim, are evidence of the contract alleged in count five.[21] They evidence no such contract. The November 30, 1962 letter merely transmitted a dental examination report and thanked Howard for his continuing cooperation. The July 26, 1963 letter notified Howard that United Aircraft was not solely responsible for the accident and that Liberty Mutual therefore would not voluntarily pay plaintiff's damages. To suggest that these letters evidence a contract of settlement, express or implied, is wholly untenable.

Moreover, there is no evidence at all, including that adduced from Howard's affidavit, that any representative of Liberty Mutual at any time requested plaintiff to refrain from suing. Nor is

17. Dotolo v. Petrucelli, 152 Conn. 654, 656, 211 A.2d 696, 697 (1965); Libero v. Lumbermens Mutual Casualty Co., 143 Conn. 269, 274, 121 A.2d 622, 624 (1956).

18. Connecticut Union of Telephone Workers v. Southern New England Telephone Co., 148 Conn. 192, 200, 169 A.2d 646, 651 (1961).

19. Sagliano Deposition, pp. 24, 49; Stevens Deposition, p. 6; Sabetta Deposition, p. 19.

20. Sabetta Deposition, p. 19.

21. Plaintiff's Answers to Defendants' Interrogatories, ¶ 17(g), filed September 26, 1964 in response to Defendants' Interrogatories, ¶ 17(g), filed March 17, 1964.

there any evidence that Liberty Mutual ever agreed to pay any specific amount demanded in settlement by plaintiff.[22]

The Court holds that plaintiff's claim of breach of a contract of settlement as alleged in count five presents no genuine issue as to any material fact and that United Aircraft as a matter of law is entitled to judgment. United Aircraft's motion for summary judgment dismissing as to it the fifth count of the complaint is granted.

## COUNT SIX

Relying upon the same evidence relied upon to support his claims of equitable estoppel in count two and breach of a contract of settlement in count five, plaintiff seeks in count six to establish a cause of action for fraudulent misrepresentation as to the alleged promised payment of his damages and for fraudulent concealment of the Connecticut one year statute of limitations for personal injury actions. United Aircraft, as with count five, contends that the acts claimed by plaintiff to constitute fraudulent misrepresentation and concealment were acts of Liberty Mutual, if anyone, and the sixth count therefore fails to allege a cause of action against United Aircraft.

Plaintiff's allegations of fraudulent misrepresentation and fraudulent concealment, viewed in the light most favorable to plaintiff, purport to state a cause of action for fraud or deceit. It is settled law that a claim of fraud or deceit requires proof of an intent to deceive.[23] Equitable estoppel, on the other hand, may be based on conduct which is unintentionally deceiving or misleading. Conduct sufficiently inequitable to warrant invoking the doctrine of equitable estoppel need not amount to actionable fraud or deceit.[24] Conduct constituting actionable fraud or deceit, however, must be such as would also give rise to equitable estoppel. The Court's holding under count two, rejecting plaintiff's claim of equitable estoppel based on representations made before and after the expiration of the one year statute

---

22. Dotolo v. Petrucelli, supra note 17; Leigh v. Smith, 138 Conn. 494, 86 A.2d 567 (1952).

23. Clark v. Haggard, 141 Conn. 668, 109 A.2d 358 (1954); Lowe v. Kohn, 128 Conn. 45, 20 A.2d 407 (1941); Laukaitis v. Klikna, 104 Conn. 355, 132 Atl. 913 (1926); Bradley v. Oviatt, 86 Conn. 63, 84 Atl. 321 (1912); Sallies v. Johnson, 85 Conn. 77, 81 Atl. 974 (1911); Morrill v. Blackman, 42 Conn. 324 (1875); Prosser, Torts § 100, at 700 (3d ed. 1964).

The four elements necessary to maintain an action for fraudulent misrepresentation, as reflected in the Connecticut cases cited above, are: (1) a statement of fact, (2) untrue and known to be untrue when made or made recklessly or without belief in its truth, (3) for the purpose of inducing another to act on it, and (4) with the result that the other party was in fact induced to act to his detriment.

24. Bergeron v. Mansour, 152 F.2d 27, 30 (1 Cir. 1945); Delson v. Minogue, 190 F.Supp. 935, 937 (E.D.N.Y.1961); Canfield v. Gregory, 66 Conn. 9, 16, 33 Atl. 587 (1895); Preston v. Mann, 25 Conn. 118 (1856); Annot., 24 A.L.R.2d 1413, 1435 (1952); Prosser, Torts § 100, at 706–707 (3d ed. 1964). But see State v. American News Co., 152 Conn. 101, 113, 203 A.2d 296 (1964); Bland v. Bregman, 123 Conn. 61, 65, 192 Atl. 703 (1937); Monterosso v. Kent, 96 Conn. 346, 350, 113 Atl. 922 (1921), where the Connecticut Supreme Court of Errors states that "generally" to invoke equitable estoppel there must be "some intended deception" or "such gross negligence on [the part of the party sought to be estopped] as amounts to constructive fraud" The apparent inconsistency between this formulation and that followed in the majority of jurisdictions, including the Supreme Court of Errors in the early cases cited above, may be explained by the necessity of a flexible doctrine, the purpose of which, as envisioned by the Supreme Court of Errors, is "not to support some strict rule of law, but to show what equity and good conscience require, under the particular circumstances of the case, irrespective of what might otherwise be the legal rights of the parties." Basak v. Damutz, 105 Conn. 378, 384, 135 Atl. 453 (1926), quoting from Canfield v. Gregory, supra at 17.

of limitations,[25] is therefore determinative of the invalidity of plaintiff's claim of fraudulent representations. In short, there is no evidence of intent to deceive.

 Nor is there any greater merit in plaintiff's alternative claim of fraudulent concealment of the Connecticut one year statute of limitations for personal injury actions. Knowledge of Section 52–584 was equally accessible to counsel for plaintiff and counsel for defendants. The statute is a matter of public record —available to Michigan attorneys and Massachusetts insurance companies alike. Assuming that Liberty Mutual could guess that plaintiff might bring suit in Connecticut, compare Earnhardt v. Shattuck, 232 F.Supp. 845 (D.Vt.1964), and was aware of the Connecticut limitation period, it had no reason to believe that plaintiff's counsel also was not aware of it and, therefore, was under no duty to disclose the existence of the statute to him.[26]

The Court holds that plaintiff's claims of fraudulent misrepresentation and fraudulent concealment as alleged in count six present no genuine issue as to any material fact and that United Aircraft as a matter of law is entitled to judgment. In view of this holding, it is neither necessary nor appropriate to reach the question whether Liberty Mutual was acting as agent for United Aircraft in making representations to Howard. United Aircraft's motion for summary judgment dismissing as to it the sixth count of the complaint is granted.

## CONCLUSION

There being no genuine issue as to any material fact and United Aircraft being entitled to a judgment in its favor as a matter of law on each count of the complaint, its motion for summary judgment is granted in all respects, with costs.

The foregoing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P.

25. Had this Court, as urged by defendant (supra note 14), limited its consideration of the evidence with regard to the equitable estoppel claim to representations made prior to the expiration of the limitation period, its holding as to equitable estoppel would not have been determinative of the fraud claim.

For purposes of this motion plaintiff's fraud claim must be viewed in the light of all representations made by Liberty Mutual, whether before or after expiration of the limitation period.

26. Roberts v. Paine, 124 Conn. 170, 199 Atl. 112 (1938); Prosser, Torts § 101, at 710 (3d ed. 1964).